UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENVILLE

| | | |
|---|---|---|
| WILLIAM SMALLWOOD, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 2:17-cv-99 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| COCKE COUNTY GOVERNMENT, | ) | |
| | ) | |
| *Defendant*. | ) | |

**M E M O R A N D U M**

Before the Court is Defendant's motion for summary judgment (Doc. 10) on Plaintiff's

claims under 42 U.S.C. § 1983, both the United States and Tennessee constitutions, and

Tennessee's retaliatory discharge statute.  (Doc. 1.)  Plaintiff responded in opposition (Doc. 16),

and Defendant replied (Doc. 17).  For the reasons that follow, the Court will **GRANT** Defendant's

motion for summary judgment (Doc. 10).

I.      **BACKGROUND**

Crystal Ottinger ("Ottinger") took office as Mayor of Cocke County, Tennessee on

September 1, 2014.  (Doc. 10-4, p. 1.)  Though many county employees had not supported her

mayoral candidacy, Ottinger did not terminate any county employees upon taking office.  At this

time, Plaintiff William Smallwood was already acting Fire Chief of the Cocke County Fire

Department.  (*Id*.)  He had been appointed to the position when the former county mayor had taken

office.

A couple of years into Ottinger's term, tension grew between two county entities—the

Cocke County Emergency Management Agency ("EMA") and the Cocke County Fire Department

(the "Fire Department").  The two agencies share office space, with the EMA office sitting above

a secondary bay in the fire hall where firetrucks are kept. In August 2016, the EMA Director, Kevin Benton ("Benton") first complained to Ottinger that he and EMA Captain Julie Brooks ("Brooks") were being harassed by Clayton "Skip" Ellison ("Ellison")—Fire Department Captain and County Commissioner—and other firefighters. (*Id.*) After these initial complaints, Benton further reported that on January 3, 2017, members of the Fire Department repeatedly operated a firetruck siren, blew the horn, and ran the engine for twenty minutes while the fire truck remained in a bay of the fire hall—sending noxious fumes upward into the EMA office space. (*Id.*) Later, Benton complained that on January 27, 2017, Ellison grabbed his (Ellison's) crotch and made sexually suggestive motions towards Benton, while Plaintiff stood next to Ellison. (*Id.*)

On February 1, 2017, Benton filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC") against Cocke County, alleging harassment and retaliation. (Doc. 10-4, Ex. A.) As mayor, Ottinger was notified of the EEOC complaint and was advised that any retaliation for filing the charge was prohibited. (Doc. 10-4, p. 2.) Ottinger subsequently met with Plaintiff on February 7, 2017. Ottinger informed Plaintiff of the EEOC complaint and ordered him not to retaliate against Benton for filing the charge. Plaintiff agreed not to do so.

A month later, Ottinger again met with Benton to discuss an incident that had occurred on March 1, 2017. (Doc. 10-4, pp. 3–4.) Benton was in his upstairs office when he noticed Ellison had climbed the stairs to use a second-floor bathroom, despite the availability of two bathrooms downstairs. Benton decided to take out the trash to avoid interaction. As Benton was returning to his office, Ellison exited the fire hall. As the two passed each other, Ellison said, "Get you some." Benton turned around, asked what Ellison had said, and informed Ellison he was recording him. Ellison grew angry, and Plaintiff and another fireman went outside to dispel the altercation. Eventually, just Benton and Plaintiff were left discussing the ongoing conflict between Benton and

Ellison when Plaintiff referenced Benton's EEOC complaint. He asked Benton, "[W]hy did you go down [to the EEOC] and make us look like a bunch of a**holes then?" This led to the following exchange:

| | |
|---|---|
| Plaintiff: | And all this bullsh** is over the budget. It all started… |
| Benton: | No. |
| Plaintiff: | …over the damn budget. Ever [sic] bit of sexual harassment, all this bullsh** just boils right around the damn budget. |
| Benton: | Right. |
| Plaintiff: | He cut our budget the same as he did yours… |
| Benton: | No. |
| Plaintiff: | …and here you are, out here raising hell, and madder… |
| Benton: | No. |
| Plaintiff: | …than hell at everybody. |

(Doc. 10-2.)

Ottinger concluded that this conversation was retaliation against Benton for filing the EEOC complaint, which she had specifically admonished Plaintiff not to do. She decided to take corrective action and met with Plaintiff on March 7, 2017. (Doc. 10-4, p. 4.) At this meeting, Ottinger gave Plaintiff a choice among four options: (1) he could agree to a written reprimand with knowledge that any other infraction would result in his termination; (2) he could resign as Fire Chief and accept another position within the Fire Department; (3) he could resign as Fire Chief without taking another position; or (4) if he chose none of the above, he would be terminated. Plaintiff refused to accept any of the options and was fired on the spot.

The following day, Ottinger issued a press release announcing Plaintiff's termination. (Doc. 10-4, p. 19.) In it, Ottinger recounted how she had discussed with Plaintiff in early February

an EEOC complaint that had been filed against Cocke County, alleging harassment by some in the Fire Department. She had specifically warned Plaintiff there were to be no further incidents of harassment under his command and no retaliation against the complainant for filing the charge. Upon later learning of two subsequent incidents she considered retaliatory, Ottinger gave Plaintiff the choice between various forms of corrective action. The press release then concluded with Plaintiff's refusal to accept any of the remedial options given him and his termination as a result.

Following his termination, Plaintiff, through his attorney, requested that he be either reinstated as Fire Chief or given a hearing before the Fire Department's Civil Service Board (the "CSB"). (Doc. 16-1.) The CSB had been created on June 20, 2016, by vote of the Cocke County Commission to oversee the administration of the "fire civil service." The CSB purported to create a "classified service," to which the Fire Chief belonged, and limited terminations of classified service members to for-cause dismissals and afforded those terminated the right to an investigatory hearing. (Doc. 16-1.) However, the validity of the CSB was called into question at some point before Plaintiff's termination. In response, the County Attorney for Cocke County penned a letter to the members of the county legislative body, concluding that existing Tennessee law expressly forbade the creation of the CSB. (Doc. 10-4, Ex. K.) Plaintiff was denied a hearing before it, and he subsequently filed suit.

Plaintiff claims, pursuant to 42 U.S.C. § 1983, that his termination deprived him of both a property and liberty interest secured by the Fourteenth Amendment to the United States Constitution. He argues the CSB's termination procedures created a constitutionally recognized interest in continued employment and that his termination without adherence to those procedures denied him due process of law. Plaintiff also brings a First Amendment patronage dismissal claim, arguing he was improperly fired for his refusal to support Ottinger in her mayoral run two years

prior to Plaintiff's termination. Finally, Plaintiff claims he was discharged in retaliation for his refusal to fire certain county employees, in violation of Tenn. Code Ann. § 50-1-304.[1]

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). A factual dispute is "material" only if its resolution might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

---

[1] Plaintiff also specifically asks the Court to decide whether the CSB is valid under Tennessee law.

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.     DISCUSSION

### A.     Section 1983 Due Process Claims

To state a claim under § 1983, a plaintiff must "demonstrate that a person acting under color of state law deprived [him] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (internal quotation marks omitted) (*citing Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). To that end, Plaintiff alleges he was not afforded due process in his termination proceedings. To establish a procedural due process violation, a plaintiff must show "(1) that [he] was deprived of a protected liberty or property interest, and (2) that such deprivation occurred without the requisite due process of law." *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 729 (6th Cir. 2011). When a state seeks to terminate a protected interest, it must afford notice and an opportunity to be heard before termination. *Id.*

### 1.     Property Interest

Plaintiff argues he had a protected property interest in his future employment as Fire Chief. A property interest in continued employment exists where a plaintiff has a "legitimate claim of entitlement" to continued employment. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Such property interests "are created and their dimensions are defined by existing rules or

understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (*quoting Roth*, 408 U.S. at 577). "A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Blazy v. Jefferson Cty. Regional Planning Comm'n*, 438 F. App'x 408, 412 (6th Cir. 2011). The Court looks to Tennessee law to determine whether Plaintiff had a property interest in continued employment. *Keller v. City of Cleveland, Tenn.*, No. 1:13-cv-91, 2014 WL 2809662, at *4 (E.D. Tenn. 2014).

Absent a contract to the contrary, employment in Tennessee is generally at-will. *Claiborne v. Frito–Lay, Inc.*, 718 F. Supp. 1319, 1321 (E.D. Tenn. 1989). And in an at-will employment relationship, "either party [may] terminate [the] relationship with or without cause." *Brown v. City of Niota, Tenn.,* 214 F.3d 718, 723 (6th Cir. 2000). Plaintiff, however, argues that the procedural protections afforded by the CSB effectively modified his at-will status by conferring on him a property interest in continued employment. In support, Plaintiff explains how the CSB created a "classified service," defined as "all personnel working on a full-time basis in the fire department in Cocke County and the chief of the department." (Doc. 16-1.) According to the CSB, no member of the classified service could be "removed, suspended, or discharged except for cause and only upon written accusation." (*Id.*) Any person so removed could request a hearing before the CSB and an investigation into whether such removal "was or was not made for political reasons and was or was not made in good faith for cause." (*Id.*) As a member of the classified service, Plaintiff contends, these termination procedures imbued him with a property interest in continued employment as Fire Chief that could only be taken away after the prescribed hearing— a hearing which he was never afforded.

The preliminary issue, though, is not whether the CSB termination procedures were sufficient to create a property interest, but whether the Cocke County local government had the authority to create the CSB in the first place. In Tennessee, local governments may exercise only those powers granted them by the state legislature, and any authority so granted is to be strictly construed. *S. Constructors, Inc. v. Loudon Cty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). The problem for Plaintiff here is that no authority with respect to the creation of civil service boards was ever granted by the state legislature. In fact, the Cocke County Commission did precisely what the Tennessee General Assembly expressly forbade it from doing when it voted to create the CSB. In addressing the authority of county officials with respect to employment decisions, Tennessee law provides:

> Elected or appointed officials, boards and department heads shall retain their present authority to make decisions and adopt policies that are not in conflict with this chapter, including, but not limited to, matters concerning hiring, compensation, promotions, transfers, layoffs, discipline, termination, and other employment matters for the employees of their respective offices. **Nothing in this chapter shall be construed as authorization for establishing systems of seniority, tenure, or classified service**, nor for creating contracts of employment or establishing the terms thereof. **Nothing in this chapter or any of the policies adopted pursuant to this chapter shall be construed to affect the employment-at-will status of any county employee** or otherwise create any contractual obligation on the part of the county as employer.

(Tenn. Code Ann. § 5-23-108) (emphasis added). Because Tennessee law expressly prohibits local governments from establishing systems of classified service, the Court finds the CSB was improperly formed and therefore null.[2] And as a legal nullity, the CSB had no power to confer a property interest in continued employment on Plaintiff. Furthermore, Plaintiff offers no other state or local law as a possible alternative basis for such an interest. Accordingly, the Court finds

---

[2] Though not binding on the Court, this same conclusion was drawn by the County Attorney for Cocke County in response to inquiries into the legality of the CSB. (Doc. 10-4, p. 13.)

Plaintiff was not deprived of a property interest upon being terminated without the hearing prescribed by the CSB.

## 2.    Liberty Interest

Plaintiff also claims a protected liberty interest in his employment as Fire Chief.  As this Court has previously stated, a liberty interest in employment "typically stems from some sort of defamation connected with an employee's termination, such as when the state 'make[s] any charge against him that might seriously damage his standing and associations in his community' or 'impose[s] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.'"  *Keller v. City of Cleveland, Tenn.*, 2014 WL 2809662 (E.D. Tenn. 2014) (quoting *Roth*, 408 U.S. at 573).  In those circumstances, the employee is due a "name-clearing hearing" if he can establish five factors:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment.... Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance.... Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

*Quinn v. Shirley*, 293 F.3d 315, 320 (6th Cir. 2002).  In addition, the plaintiff must actually request a name-clearing hearing.  *Id.*  Because it is the denial of such a hearing that deprives the employee of his or her liberty interest without due process, the employer violates the employee's due process rights only where the employee requests a name-clearing hearing and is denied.  *Id.*

Plaintiff has made no attempt to demonstrate any of the above factors.  For his part, Plaintiff does claim the real reason behind his termination was his refusal to support Ottinger's campaign and his subsequent refusal to fire Ellison for Ellison's political beliefs[3]—statements that could

---

[3] These claims are discussed in greater detail below.

perhaps be "stigmatizing" in conjunction with one's termination. What Plaintiff fails to allege, though, is whether these statements were ever actually "stated" at all, publicly or otherwise.[4] Moreover, the reason behind the termination that *was*, in fact, publicized in a press release detailed how Ottinger had ordered Plaintiff not to retaliate against an EEOC complainant and how Plaintiff defied that order. As an initial matter, Plaintiff has offered no reason why such an allegation would not be excepted under the second prong of the above test as one of "merely improper or inadequate performance, incompetence, neglect of duty, or malfeasance." What's more, though, Plaintiff does not challenge the truth behind this publicized explanation. He suggests it was a pretext for his termination. But he does *not* deny the incident between Benton and Ellison occurred, nor does he deny his subsequent conversation with Benton—each of which formed the *publicized* basis, pretense or not, for his termination.

Because Plaintiff has failed to demonstrate the above factors, the fact that he requested a name-clearing hearing is of no consequence; only where a plaintiff has established the *Quinn* elements is he or she then entitled to such a hearing. *Quinn*, 293 F.3d at 320. The Court addresses Plaintiff's request, however, because the entity before which he made it points to a more fundamental flaw in Plaintiff's liberty claim—that is, that he has failed to demonstrate a protected liberty interest altogether. Even assuming Plaintiff had satisfied the above factors, the Sixth Circuit in *Ferencz v. Hairston*, 119 F.3d 1244, 1249 (6th Cir. 1997) reiterated that reputation alone

---

[4] In his affidavit, Plaintiff outlines the basis for his belief that his termination was politically motivated. (Doc. 16-1, p. 12.) He states that neither he nor Ellison supported Ottinger's mayoral campaign; Ottinger visited the Fire Department once per week, which she allegedly did not do with other departments; she pressured Plaintiff to fire Ellison, threatening to suspend Plaintiff for failing to do so; Ottinger promoted two individuals in the Fire Department against Plaintiff's advice; and on numerous occasions, Plaintiff felt threatened by Ottinger for refusing to support her political campaign. Even taken as true, however, these allegations, at most, indirectly suggest Ottinger's treatment of Plaintiff was politically motivated. Nowhere does Plaintiff allege that Ottinger stated, privately or publicly, that Plaintiff's termination was a specific result of Plaintiff's political leanings.

is neither a "liberty" nor "property" sufficient to invoke due process protection. A defamatory publication must also be "accompanied by the deprivation of [a] more tangible interest such as *continued employment*" in order to birth a protected liberty interest. *Id.* (emphasis added). This Court, however, has already determined that the improperly-formed CSB could not confer an interest in continued employment. Without this attendant interest, according to *Ferencz*, any defamatory publication in connection with Plaintiff's termination is insufficient to establish a protected liberty interest for which due process must be afforded. As such, Plaintiff's liberty claim must fail.

Because Plaintiff had neither a property nor liberty interest in continued employment as Fire Chief, Defendant is entitled to judgment as a matter of law on Plaintiff's § 1983 due process claims.

**B.     Section 1983 First Amendment Claim: Patronage Dismissal**

Plaintiff further claims his termination was politically motivated. Specifically, he claims he was subject to an unlawful "patronage dismissal"—discharged for his refusal to support Ottinger's mayoral campaign and for his refusal to fire Ellison for Ellison's political beliefs.[5] This discharge, according to Plaintiff, violated his First Amendment rights.[6]

---

[5] In his complaint, Plaintiff does not specifically allege a patronage dismissal or a violation of the First Amendment. He alleges more broadly that his politically motivated termination violated his constitutional rights. However, in his response to Defendant's motion for summary judgment, Plaintiff does specifically claim he was subject to patronage dismissal in violation of the First Amendment.

[6] "The first step in assessing a patronage dismissal claim requires asking whether the plaintiff has produced sufficient evidence for a jury to find that he was discharged because of his political beliefs or affiliations." *Peterson*, 777 F.3d at 343. The Court here, however, does not reach this question. Because the Court finds that political affiliation would be an appropriate consideration in Plaintiff's termination, whether or not Plaintiff has produced sufficient evidence that his termination was politically motivated is inconsequential for the purposes of the Court's resolution of the motion before it.

As a general rule, patronage dismissals of public employees based upon political views or affiliations violate the employees' First Amendment freedoms of political belief and association. *Peterson v. Dean*, 777 F.3d 334, 341 (6th Cir. 2015) (*citing Elrod v. Burns*, 427 U.S. 347, 356–57 (1976)). This general rule, however, protects only some public employees. The United States Supreme Court has held that those public employees holding "non-policymaking positions" are protected from politically motivated terminations; these individuals "usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." *Elrod*, 427 U.S. at 367. On the other hand, public employees in "policymaking positions" *can* be dismissed for political reasons, as such dismissals serve "the valid governmental objective of preventing holdover employees from undermining the ability of a new administration to implement its policies." *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir. 1997) (*citing Elrod*, 427 U.S. at 367)). Public employees in this latter category fall under the so-called "*Elrod-Branti* exception" to the general prohibition against patronage dismissals.[7] The question, here, is whether or not Plaintiff held a "policymaking" position as Fire Chief of Cocke County.

The distinction between policymaking and non-policymaking positions is made on a case-by-case basis. *Peterson*, 777 F.3d at 341. The "nature of the responsibilities [of the position in question] is critical" to this distinction, and "consideration [should be given] to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Id*. "[T]he ultimate inquiry is not whether the label 'policymaker' . . . fits a particular position." *Branti v. Finkel*, 445 U.S. 507, 518 (1980). The question, rather, is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id*. "This test requires the courts to look beyond the mere job title and

_____

[7] The two United States Supreme Court cases from which this exception is derived are *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980).

examine the inherent duties of the position at issue and the duties that the new position-holder will perform." *Peterson*, 777 F.3d at 342.

To this end, the Court of Appeals for Sixth Circuit has carved out four categories of positions that fall with reasonable certainty under the *Elrod–Branti* exception to the prohibition against patronage dismissals:

> **Category One**: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

> **Category Two**: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

> **Category Three**: confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;

> **Category Four**: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

> If a particular position falls into one of these categories, then political affiliation is an appropriate consideration for that position and a public employee may be dismissed without violating the First Amendment. A government position is not required, however, to fall neatly within one of the categories to be entitled to the *Elrod–Branti* exception.

*Sowards v. Loudon Cty.*, 203 F.3d 426, 435-36 (6th Cir. 2000) (*quoting McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996)). In addition, the *Elrod-Branti* exception is to be construed broadly. *Peterson*, 777 F.3d at 342. "If there is any ambiguity about whether a particular position falls into any of [the four categories] . . . , it is to be construed in favor of the governmental defendants when the position at issue is unclassified or non-merit under state law." *Id*.

The Sixth Circuit in *Tompos v. City of Taylor*, 644 F. App'x 678 (6th Cir. 2016), faced a question nearly identical to that the Court faces here. In *Tompos*, the former fire chief in Taylor, Michigan claimed he had been improperly fired by the mayor for political reasons. In deciding whether the position of fire chief fell under the *Elrod-Branti* exception, the court recounted the fire chief's duties as defined in the city fire department's rules and regulations, which included:

> (1) control[ling] . . . all assignments of all firefighters and employees in the Department; (2) disciplining and removing firefighters; (3) direct[ing] the observance and enforcement of all fire prevention laws of the State of Michigan, and the ordinances of the City of Taylor; (4) keep[ing] the Mayor and City Council fully acquainted with . . . all . . . pertinent information to his/her office; (5) investigating reports of "violations of law or ordinances, rules and regulations, or orders governing the department; and (6) visit[ing], or caus[ing] to be visited, . . . all divisions of the Fire Department to inspect the efficiency of the Department.

*Id*. at 682 (internal quotation marks omitted). The Sixth Circuit found that the discretionary power the Taylor fire chief exercised over the enforcement of fire prevention laws and the implementation of fire department policies funneled the fire chief into Category Two.[8] The plaintiff therefore fell under the *Elrod-Branti* exception and *could* be terminated for political reasons.

The Court fails to see how the instant case proves appreciably different. First, Tennessee law expressly confers broad discretionary authority on county fire chiefs. Tennessee Code Annotated § 5-17-103 reads in pertinent part:

> (a) The county-wide fire department shall be headed by an official to be known as the county fire chief, in whom shall be vested all the powers of the agency and the right to delegate those powers to such persons as the fire chief may see fit.
>
> (b) While responding to, operating at, or returning from an emergency site, the fire chief, or any member serving in the capacity of fire officer in charge, shall have all authority granted to municipal fire departments by § 6-21-703.

---

[8] The reason the Sixth Circuit upheld the fire chief's classification as a Category Two position, as opposed to Category One, was because the position was not expressly named in Michigan law.

Section 6-21-703(a) then details, in ten subparts, the authority the fire chief wields in responding to emergencies, including the power to control all activities at the scene of the emergency, to order persons to leave the premises, to block streets, to trespass without liability, and to order the destruction of property.

Going further, the Cocke County government's description of the Fire Chief's duties grants broader authority than even the Tennessee statute. In the "Nature of Work" section of this description, the Fire Chief is said to assume full responsibility for the overall operation of the Fire Department and supervision of departmental personnel; ensure the proper training of departmental personnel in emergency response practices and protocols; maintain hydrants and other firefighting equipment located in the county; establish and implement operational policies and procedures; prepare the department annual budget and grant applications; and participate in public education and safety awareness activities. (Doc. 10-4, Ex. L.) The "Illustrative Examples of Work" section then provides that the Fire Chief:

- Assumes full responsibility for department operations and supervises and directs the activities of all departmental personnel;

- Develops and implements all departmental policies and procedures and ensures that they are consistently adhered to;

- Assumes responsibility for the development of the departmental budget, procurement and purchasing of materials and equipment, and monitoring the expenditure of funds;

 …

- Evaluates reports of any unusual activities occurring during various shifts and/or breaches of operational procedures and takes immediate disciplinary action when warranted.

(*Id.*)

This is precisely the type of discretionary authority the Sixth Circuit has said accompanies a policymaking position and tracks the categorical scheme in *McCloud* in lockstep.[9]  The Cocke County Fire Chief controls departmental policies, public outreach, the department budget and grant applications, disciplinary action, and emergency response procedures.  This broad "discretionary authority" is granted to a position "specifically named" in relevant state law; it is granted "with respect to the enforcement of that law;" *and* it is granted to "carry out . . . a policy of political concern"—the operation of one of the county's primary emergency response institutions.  As such, the Court finds the Cocke County Fire Chief position falls firmly within Category One of the *McCloud* framework.  Therefore, even assuming Plaintiff's termination was indeed politically motivated, such a firing was not improper under the First Amendment.

In resisting classification as a policymaker, Plaintiff first cites *Lane v. City of Lafollette, Tenn.*, 490 F.3d 410 (6th Cir. 2007).  There, the former city Recreation Director alleged he had been improperly discharged by the mayor for political reasons.  The Sixth Circuit declined to except the Recreation Director position under the *Elrod-Branti* framework, even though the city argued that the Recreation Director managed his own department, devised the budget, and worked closely with the city council.  *Id*. at 422.  The court, however, never reached the substantive question of whether these alleged duties rendered the Recreation Director removable for his political beliefs.  It found, rather, that the city had not met its burden.  On the record before it, the court could not determine "whether the Recreation Director 'perform[ed] solely ministerial tasks with no policymaking functions,'" because the city's proof did not specifically speak to the position of Recreation Director and did not address the position's actual duties.  *Id*.  The record

---

[9] *See, e.g.*, *Dixon v. Univ. of Toledo*, 702 F.3d 269 (6th Cir. 2012) (associate vice president for human resources held policymaking position, where he was responsible for answering grievances, issuing disciplinary and corrective action, supervising employees, and recommending and implementing policy).

here, in contrast, suffers no such deficiency.  The Court has before it a Tennessee statute and a four-page description of the Fire Chief's duties prepared by the county, evincing responsibilities well beyond anything "solely ministerial" in nature.  Plaintiff's reliance on *Lane* is unavailing.

Plaintiff also cites *Sowards*.  There, a former county jailer alleged she had been fired by the sheriff's department as a result of her husband's decision to run for the position of county sheriff against the then-incumbent.  *Sowards*, 203 F.3d at 430.  Pertinent Tennessee law tasked jailers with, among other things, ensuring inmate safety during transport, guarding against escape, furnishing adequate food and bedding, and enforcing cleanliness.  *Id*. at 436.  The defendants argued that these responsibilities, and the serious consequences attendant to failing them, lifted the jailer into policymaker status.  Both the defendant sheriff and the chief jailer, however, admitted that the plaintiff's position as a jailer "did not involve any policymaking for the day-to-day operation of the prison facility" and that the plaintiff merely "carr[ied] out the duties and orders" given her.  *Id*. at 437.  No such admission has been made in the instant case.  In fact, the second "illustrative example of work" in the Cocke County job description expressly charges the Fire Chief with "develop[ing] and implement[ing] *all departmental policies and procedures* and ensur[ing] that they are consistently adhered to."  (Doc. 10-4, Ex. L) (emphasis added).  This duty is immediately preceded by the Fire Chief's assumption of "full responsibility for departmental operations and supervising and directing the activities of all departmental personnel." (*Id*.)  These duties, as previously noted, are then further supplemented by the Fire Chief's control over the department budget, public outreach, internal disciplinary action, and emergency response protocol. (*Id*.)  This discretionary authority readily distinguishes the Fire Chief's position from the jailer's in *Sowards*.

Plaintiff's remaining arguments are similarly unpersuasive. First, Plaintiff contends he falls outside the *Elrod-Branti* exception because his position is not "inherently political." (Doc. 16.) This, though, is not the standard adopted in *McCloud*. The phrase "inherently political" appeared in *Faughender v. City of N. Olmstead, Ohio*, 927 F.2d 909, 913 (6th Cir. 1991)—the seminal pre-*McCloud* patronage dismissal case. The Sixth Circuit there defined "policymaking" positions as those in which "party affiliation is an appropriate requirement for the effective performance" of the position. *Id*. The court then instructed that to determine whether party affiliation is an appropriate requirement for a position, the court "must examine the inherent duties of that position *and* the duties that the new holder of that position will perform. A plaintiff's failure to meet either part of this test would cause the claim to be dismissed." (*Id*.) Applying this test to the plaintiff's position as secretary to the mayor, the court held the plaintiff's claim "fail[ed] under either part; the duties of the mayor's secretary are inherently political, and the duties as [the new position holder] envisions them are also inherently political."[10] (*Id*.)

Plaintiff's reliance on this language is misplaced for a number of reasons. First, the *Faughender* court merely stated that since the position of secretary to the mayor was inherently political, the "appropriate requirement" standard was satisfied. It did *not* hold that the "appropriate requirement" standard is *only* satisfied where the position at issue is inherently political. Second, the *McCloud* court notably omitted the "inherently political" language from the categorical scheme it established. Instead, it held that party affiliation is an appropriate requirement where the position

---

[10] The Sixth Circuit has addressed *Faughender*, and what precisely to do with it, somewhat murkily after *McCloud*'s announcement of the categorical scheme. In many cases, the court does not mention *Faughender* at all. *See Dixon*, 702 F.3d 269; *Tompos*, 644 F. App'x. 678; *Peterson*, 777 F.3d 334. In others, the court undertakes *Faughender* analysis alongside the *McCloud* framework with no allusion as to how one is to affect the other or whether both tests must be satisfied. *See Hoard v. Sizemore*, 198 F.3d 205 (6th Cir. 1999); *Hager v. Pike Cty. Bd. of Educ.*, 286 F.3d 366 (6th Cir. 2002). Nevertheless, the Court undertakes both analyses here.

at issue falls into one of the delineated categories—categories not defined by inherent politicization.[11]  *McCloud* at 1562.

Most significantly, though, this Court's conclusion would remain unchanged even under an "inherently political" standard.  This concept is a nebulous one, as the Sixth Circuit has not provided a precise definition of "inherently political."  Nonetheless, it has dropped some clues along the way—clues bearing close resemblance to the analysis in *McCloud* and its progeny.  Of particular significance, the Sixth Circuit in *Hoard* identified wide discretionary authority as a hallmark of an inherently political position in assessing the senior citizens director for the county in question.  *Hoard*, 198 F.3d at 216.  This position oversaw the daily operation of two senior citizen homes, supervised every employee working at those facilities, ordered supplies for those facilities, implemented program policy, and appropriated funds within the program's budget—a virtual mirror image of the Fire Chief's responsibilities here: overseeing the daily operation of the fire department, supervising all its employees, purchasing department materials, developing and implementing policy, and devising the department budget.  If such duties render the position of senior citizens director in *Hoard* inherently political, the same must be said of the Cocke County Fire Chief.[12]

---

[11] The Court additionally notes that Plaintiff has made no attempt to specifically satisfy the *Faughender* two-part test.  First, he does not dispute the Fire Chief's duties as described by Defendant or the county's job description.  Moreover, Plaintiff submits no evidence that the county's job description, which has been in place since at least 2007, would have changed or been envisioned differently by the new position holder.

[12] The Sixth Circuit left other hints as to the meaning of "inherently political," as well.  In *Blair*, it emphasized the weight that budgetary authority holds in the political calculus, and in *Hoard*, identified having a "broad range of responsibilities" as another telling marker.  With control over the department budget, as well as departmental policies, public outreach, grant applications, disciplinary action, and emergency response procedures, the Fire Chief position checks off these additional boxes.

Even if the Fire Chief position was not inherently political, however, Plaintiff further contends that the CSB had already spoken to the "appropriateness" of a party affiliation requirement in hiring and firing. The CSB's Rules and Regulations proscribed the termination of civil service members based on political or religious beliefs.[13] This proscription, says Plaintiff, forecloses any possibility that party affiliation might be considered an "appropriate requirement" for civil service positions. To begin, Plaintiff offers no explanation as to why or how such a proscription would override the applicability of *McCloud* Category One, as demonstrated earlier. More significantly though, this contention also overlooks the improper formation of the CSB in the first place. The Tennessee General Assembly expressly forbade local governments from establishing systems of classified service affecting county officials' authority over employment matters in their respective offices. Formed contrary to law, the CSB had no authority to limit the Cocke County mayor's termination practices, and for the Court to rely on a provision doing just that would be improper.[14]

Finally, in an attempt to downplay his discretion as Fire Chief, Plaintiff submits that his authority to hire, promote, and terminate employees was limited by the mayor, pointing specifically to an instance in which Ottinger had promoted two individuals within the Fire

---

[13] "No person shall be appointed or promoted to, or demoted or dismissed from, any position in the classified civil service, or in any way favored or discriminated against with respect to the employment in the classified service because of his political or religious opinions." (Doc. 16-1.)

[14] The Sixth Circuit in *Lane* faced a similar but distinct issue. In examining whether party affiliation was an appropriate requirement for the position of city Recreation Director, the court looked to both the LaFollette, Tennessee city charter and the city employee handbook—both of which provided that city employees were to be chosen and terminated without regard to political affiliation. *Lane*, 490 F.3d at 421-22. Aside from the fact that neither of these provisions ruled the day in the court's ultimate decision, there was also no indication that the employee handbook had been enacted contrary to law as the CSB was here. Furthermore, Plaintiff has failed to point the Court to any county charter provision similar to that in *Lane*.

Department against his advice.  As the court in *Tompos* noted, however, "the fact that the fire chief exercises authority delegated and circumscribed by the [m]ayor in no way precludes classifying the position of fire chief as a policymaking employee."  *Tompos*, 644 F. App'x at 682–83.  Additionally, Plaintiff addresses no other ways, beyond employment decisions, in which the mayor restricted his authority—leaving untouched his discretion with respect to implementing departmental policies, public outreach, the department budget and grant applications, disciplinary action, and proper emergency response protocol.  Thus, even if Plaintiff did not wield total freedom with respect to promotion decisions, he still retained a degree of discretionary authority that rendered him a policymaker within the meaning of *McCloud*.

## C.    State Law Claims

Plaintiff also raises a number of claims under Tennessee state law.  Brought in a federal-question case, these state law claims can only be heard by the Court through the exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  This provision confers on the district court supplemental jurisdiction over those state law claims that are so related to the accompanying federal claims that "they form part of the same case or controversy."  28 U.S.C. § 1367(a).  The exercise of federal supplemental jurisdiction, though, is discretionary.  District courts may decline to exercise supplemental jurisdiction over a state law claim if:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the
       district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction,
       or
(4) in exceptional circumstances, there are other compelling reasons for declining
       jurisdiction.

28 U.S.C. § 1367(c).

Generally, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). However, "there is no categorical rule that the pretrial dismissal of a federal claim bars a court from deciding remaining state law claims." *Id.* Instead, the decision regarding the exercise of supplemental jurisdiction "depends on judicial economy, convenience, fairness, and comity." *Id.* at 1254 (internal quotations omitted). Moreover, district courts have "broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Id.*

Because the state law claims at issue here are so closely related to the dismissed federal claims, the Court finds that the interests of judicial economy and convenience of the parties would be served by exercising supplemental jurisdiction over Plaintiff's remaining state law claims. The Court addresses each in turn.

### 1. Tennessee Constitution Due Process Claim

In addition to his due process claim under the Fourteenth Amendment to the United States Constitution, Plaintiff alleges an identical due process violation under Article I, § 8 of the Tennessee constitution. This section provides:

> That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land.

Tenn. Const. art. I, § 8. Though worded differently than its federal counterpart, Article I, § 8 has been deemed "synonymous with the due process provisions of the federal constitution," as Plaintiff himself acknowledges. *Lynch v. City of Jellico*, 205 S.W.3d 384, 391 (Tenn. 2006). Thus, "[a]ny prerequisites necessary to prove a due process violation under the United States Constitution would, therefore, be applicable to proving a violation of Article I, Section 8 of the Tennessee

Constitution." *Nichols v. Tullahoma Open Door, Inc.*, 640 S.W.2d 13, 16 (Tenn. Ct. App. 1982). Plaintiff here offers no additional arguments in support of his state due process claim, instead relying on the same evidence and analysis advanced in support of his federal due process claim. Accordingly, as the Court has already found no deprivation of due process under the Fourteenth Amendment to the United States Constitution, it finds that Plaintiff's identical due process claim under Article I, § 8 of the Tennessee constitution is, likewise, without merit.

### 2. Retaliatory Discharge Claim

Finally, Plaintiff alleges his termination violated Tennessee's retaliatory discharge statute. Specifically, he brings his claim under subsection (b), which provides that "no employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). The statute defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). To establish a *prima facie* case under this provision, the plaintiff must show four elements: "(1) the plaintiff's status as an employee of the defendants; (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee." *Caruso v. St. Jude Children's Research Hosp.*, 215 F. Supp. 2d 930, 937 (W.D. Tenn. 2002).

Plaintiff claims he was terminated, at least in part, because of his refusal to fire Ellison for Ellison's political beliefs. As noted previously, the CSB's rules and regulations provide that "[n]o person shall be . . . demoted or dismissed from, any position in the classified civil service, or in any way favored or discriminated against with respect to employment in the classified service

because of his political or religious opinions." (Doc. 16-1.) Had he terminated Ellison in contravention of this CSB provision, Plaintiff contends, he would have engaged in an "illegal activity" as defined in Tennessee Code Annotated § 50-1-304(a). And terminating Plaintiff for "refusing to participate in" this illegal activity, Plaintiff says, violated his rights under the Tennessee's retaliatory discharge statute.

The Court, however, has already held that the CSB was created contrary to law. As such, any rules and regulations enacted by the CSB are necessarily void and cannot form the basis for Plaintiff's retaliatory discharge claim. Because Plaintiff has offered no alternative grounds for this claim, the Court finds no violation of Tennessee's retaliatory discharge statute.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes Plaintiff has not carried his burden with respect to his claims under 42 U.S.C. § 1983, both the United States and Tennessee constitutions, and Tennessee's retaliatory discharge statute. The Court will **GRANT** Defendant's motion for summary judgment. (Doc. 10.)

**An order shall enter.**

<u>/s/</u>_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**